[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
History of the Case:
This is an appeal from a decision of the Planning and Zoning Board of Appeals of the Town of Greenwich, which granted the Defendant Brunswick School's application for a special exception. The purpose of the special exception was to permit the Defendant school to add to and alter certain of the school's buildings and to allow an increase in student enrollment.
By application dated July 10, 1989, Brunswick appealed to the Board the decision of the Building Inspector denying Brunswick's application to make additions and alterations to an existing structure on Maple Avenue owned by Brunswick and known as the Lower School. (Record, Item 1, Application.) On appeal to the Board, Brunswick requested "permission to make additions and alterations to an existing structure, the proposed additions to total 10,633 square feet, and the proposed alterations to provide for two faculty residences," and "relief from the conditions of [prior] appeal decisions [of the Board] number [sic] 4927 and 5098 limiting the size of the student body and the school staff." (Record, Item 1.) Brunswick requested the Board to approve the above as a special exception in accordance with section 6-94 (5) [sic: 6-94 (a)(5)] of the Greenwich Building Zone Regulations on grounds that the "Brunswick School is not operated for commercial profit" and "[a]ll special exception standards are met." (Record, Item 1; Item 4, Transcript, p. 5.) The subject property is located in an R-20, "Single Family Residence 20,000 square feet," zone. (Record, Item 1; Item 5(b), Set of Plans, p. 1, Site Plan; Item 10, Building Zone Regulations, section 6-2 (November 1986, revised to November 15, 1989) [hereinafter: the "Regulations"]; Item 11, Building Zone Regulation Map. )
Section 6-19 (a)(4)(A) of the Regulations gives the Board the power to "[d]ecide requests for special exceptions . . . wherever special exception is authorized in these regulations . . ." Section 6-94 (a)(5) of the Regulations provides:
 (a) The following uses shall be permitted in RA-4, RA-2, RA-1, and R-20 and R-12 Zones when authorized by the Board of Appeals as special exceptions: . . .
 (5) Churches, educational institutions not operated for commercial profit.
CT Page 1391
Section 6-20 (c) of the Regulations sets forth the conditions and standards which must be met prior to the granting of a special exception.
A public hearing was held on this matter on September 20, 1989. (Record, Item 3, Legal Notice; Item 4.) On October 2, 1989, the Board resolved that Brunswick's appeal/application be granted. (Record, Item 6, Minutes, dated 10/2/89; Item 9, Certified copy of decision.) The Board authorized as a special exception the requested additions and proposed alterations, and placed a limitation on the total student enrollment in the Lower, Middle, and Upper Schools of 515 students, amending conditions previously imposed in prior decisions of the Board relating to Brunswick's property. (Record, Item 6; Item 7, Letter of Decision.) Plaintiffs appeal this decision.[1]
Aggrievement
The Court has subject matter jurisdiction in this appeal. Procedural irregularities caused Harry T. Constas to withdraw as Plaintiff but he remained as counsel of record for the other Plaintiffs.[2] (See Zoarski, et al. v. Branford Planning and Zoning Commission et al., 15 CLT 48.)
Of the remaining Plaintiffs, Mary T. Kinahan testified that she owned property "next door" to the subject property, Brunswick School, and the Court finds that she is aggrieved.
ISSUES
A. Floor Area Ratio Merger
Plaintiffs first argue that Brunswick's proposal violated the floor area ratio ["FAR"] limitation applicable to an R-20 zone. The Regulations define FAR as "the ratio of the floor area . . . of a building to the total lot area on which the building is located." Regulations, section 6-5 (a)(23). The FAR in an R-20 zone is .25. Regulations, section 6-205 (a). A lot is defined as "a parcel of land occupied or to be occupied by a building or group of buildings and their accessory uses, including such open spaces as are required by these regulations and such other open spaces as are used in connection with the buildings." Regulations, section 6-5 (a)(33).
Plaintiffs claim that the property referred to as the Lower School and described as extending between Maple and Maher Avenues is made up of four (4) lots, each subject to a 25% FAR limitation, and that Brunswick is attempting to "transfer" the right to build on 25% of each of the smaller lots, now only containing faculty residences and a business office, to the lot on which the school CT Page 1392 building is located. Plaintiffs argue that no merger of said four (4) lots has occurred and that it may not occur because residential property may not merge with school property. Plaintiffs cite no authority for this proposition.
Defendants respond that the four (4) parcels are one lot, as that term is defined and used in the Regulations, that the boundary lines disappeared for zoning purposes, that all buildings thereon are principal educational uses, or, in the alternative, permitted accessory uses, and that each parcel was granted special exception status as a non-profit educational use. Defendants claim that the facts support a finding that merger has occurred, and therefore, Brunswick's proposal satisfies the FAR limitation.
"[C]ontiguous land owned by the same person does not necessarily constitute a single lot." Marino v. Zoning Board of Appeals, 22 Conn. App. 606, 609 (1990) (citing Molic v. Zoning Board of Appeals, 18 Conn. App. 159, 164-65 (1989)); Schultz v. Zoning Board of Appeals, 144 Conn. 332, 338 (1957). Also, the "taxation of multiple parcels of land by the assessor's office as one tract does not compel a finding of merger." Marino, supra at 609. Similarly, "the fact that a deed description references multiple lots from a map filed in the land records does not compel a finding of an absence of merger." Id. However, these factors may be considered by the local authority "as part of the evidentiary foundation to support a finding of merger if they are relevant and probative." Id. It is a "basic proposition that in a determination of the factual issue of merger, the intent of the property owner must be ascertained and that no single factor is dispositive." Id. at 610 (citing Molic, supra at 164.)
"An owner of contiguous parcels of land may merge those parcels to form one tract if he desires to do so." Molic, supra at 164. "An intent on the part of the owner to do so may be inferred from his conduct with respect to the land and the use which he makes of it." Id. "Intent is a question of fact." Id. (citation omitted). Also, "some zoning regulations . . . require, either expressly or implicitly, that under certain conditions a non-conforming lot merges with contiguous land owned by the same owner." Id. (citing, inter alia, Neumann v. Zoning Board of Appeals, 14 Conn. App. 55, 60, cert. denied, 208 Conn. 806
(1988)). See Regulations, section 6-9.
"Once a local zoning authority has found or could have found, from the record before it, that there was a merger of lots, the trial court is "restricted to a determination of whether the board's finding of merger was reasonably supported by the record . . ." Marino, supra at 608 (citing Horn v. Zoning Board of Appeals, 18 Conn. App. 674, 677 (1989)). "A trial court cannot disturb a zoning board's factual finding of merger as long CT Page 1393 as that finding is the product of an honest judgment reasonably exercised. To do so would be an improper substitution of the trial court's judgment for that of the board." Id. (citation omitted.)
The plans submitted to the Board show that Brunswick originally calculated the total permitted building area by adding the acreage of the four (4) parcels and multiplying the total acreage by the .25 FAR (3.694 acres, which is 160,910.64 square feet, multiplied by .25 equals 40,227.66 square feet.) Brunswick then calculated the building area remaining on the property by subtracting the total area of the existing building on all four (4) parcels from the total permitted building area (40,277.66 minus 27,952.51 equals 12,275.15 square feet.) Since the remaining building area (12,275.15 square feet) is greater than the area of the proposed additions (10,663 square feet), the project is well within the FAR limitation, if indeed the parcels have merged. (Record, Item 1(b), FAR Summary, Figures Prior to Revision.)
Plaintiffs argue that the three (3) parcels on the easterly side of Maher Avenue cannot be included in the total building area because special exceptions to operate a school on those parcels were never obtained. Plaintiffs maintain that residential property may not be merged with school property. (see Record, Item 4, pp. 64-5.) Plaintiffs claim that each of the four (4) parcels is assessed separately and is listed separately at the tax assessor's office. However, there is no documentary evidence in the record to this affect.[3] Plaintiffs admit that all four (4) parcels are tax exempt but argue that this is not so because they are part of the school parcel but because they are owned by a not-for-profit, tax-exempt owner. Plaintiffs also point to the fact that the parcels were acquired at different times, and that separate applications were made to the Board for each parcel (discussed below).
The record shows that the Board approved a special exception in September 1970 for the Maple Avenue parcel authorizing its use for a school. (Record, Item 5(q). Appeal #4927.) Also, in January, 1972, the Board authorized an addition to the school building "and use of [a] walkway crossing [the] residential property [to Maher Avenue]." (Record, Item 5(r), Appeal #5098.) Thus, it could be argued that in January, 1972, the Board characterized the property on the easterly side of Maher Avenue as residential.
However, at the hearing on Brunswick's application, held on September 20, 1989, Brunswick's attorney presented, orally, the following history of the subject property: The Maple Avenue portion of Brunswick's property was a girls' school called the CT Page 1394 Greenwich Academy from 1916 to 1966. Between 1966 and 1970, the Maple Avenue portion was used by the Educational Records Bureau, which sold it to Brunswick in 1970. Since 1971, Brunswick has operated the Lower School on the Maple Avenue parcel. (Record, Item 4, pp. 11-12.) Counsel continued:
 In 1970, Brunswick, as I say, took the site over as its Lower School. With its special exception status having been approved by this Board of Appeals, in the appeals numbered 4927 in 1970 and 5098 in 1972. Some of the older buildings including Century Hall, which is indicated on the print as closest to the property of Fisher on the northerly boundary which is still there, were used in conjunction with a new one story building which we know as Stevenson Hall shown in outline on the site plan just south of Century Hall.
 Since Brunswick's acquisition of this original Greenwich Academy property, and the original opening of its Lower School the campus has expanded through to Maher Avenue.
 Firstly, we acquired a large piece of property shown as headmaster's dwelling with a small, relatively small outbuilding adjoining the property of Mr. Bloom and the Stettafords.
 This property is situated, the headmaster's house and on this property, this cottage, subsequently converted to faculty housing in accordance with Planning and Zoning Board of Appeals number 5455 in 1974 and 6563 in 1982. What is now the business office with the apartment over it, which is the next piece, just moving north from the headmaster's house, was subject to Planning and Zoning Board of Appeals number 6047 in 1978.
 The house adjoining the business office on the north, which is now housing for two faculty families, was approved by Planning and Zoning Board of Appeals numbers 5118 in 1972 and 7202 in 1987.
 So that the present use of the Lower School campus, that's the entire site, is for the above uses and of course, grades one through five and the main school. The balance of the campus is parking, playground and open space.
(Record, Item 4, pp. 12-14.) The site plan shows the location of the four parcels, the school parcel on the westerly side of Maple CT Page 1395 venue and the three (3) after-acquired parcels on the easterly side of Maher Avenue. (Record, Item 5(b), p. 1.)
Thus, both plaintiffs and Brunswick refer to and argue the significance of prior decisions of the Board with respect to the three (3) parcels on the Easterly side of Maher Avenue. Copies of these decisions of the Board were submitted to the commission in with Brunswick's application for site plan and special permit approval. (See Constas v. Planning and Zoning Commission, Record, Item 18-B; Kinahan v. Planning and Zoning Commission, Record, Item, 24 [hereinafter: "PZC Record I" and "PZC Record II", respectively].) Therefore, while these decisions of the Board do not appear in the return of record in the instant case, plaintiffs and Brunswick were well aware of their existence and content. The Board has knowledge of its prior decisions. Therefore, the prior decisions of the Board relating to Brunswick's property can be said to have formed part of the record upon which the Board acted in this case and that therefore the Court may refer to those prior decisions in deciding this appeal.
The prior decisions of the Board confirm the above-quoted testimony and show that in March, 1972, the Board authorized as a special exception the conversion of an existing one-family dwelling on the northern-most parcel on the easterly side of Maher Avenue to provide quarters for two faculty families "as an accessory use to a private non-profit school . . ." (See PZC Record I, Item 18-B, p. 5, and PZC Record II, Item 24, p. 8, Appeal #5118; Record, Item 4, p. 13.) This decision was amended by the Board in 1987 to "permit addition to dwelling (existing faculty housing) accessory to non-profit school . . . special exception standards hav[ing] been met under Sections 6-19, 6-20, and 6-94 (a)(5) of the . . . Regulations." (See PZC Record I, Item 18-B, p. 7, and PZC Record II, Item 24, p. 10, Appeal #7207; Record, Item 4, p. 13.)
In June, 1974, the Board granted a "variance of yard requirements and [authorized] a special exception to permit garage building to be converted to one-family dwelling for faculty housing on the easterly side of Maher Avenue." (See PZC Record I, Item 18-B, p. 9 and PZC Record II, Item 24, p. 12, Appeal #5455.) This is the southernmost parcel on the easterly side of Maher Avenue which contains the headmaster's dwelling. (Record, Item 4, p. 13.) The site plan shows the converted garage as a "cottage". (Record, Item 5(b), p. 1.) This parcel was also the subject of another appeal in August, 1982, in which the Board granted "a special exception . . . to permit addition to dwelling for faculty housing, on the easterly side of Maher Avenue . . . the standards hav[ing] been met under Sections 6-19, 6-20 and 6-94 of the . . . Regulations. . .". (See PZC Record I, Item 18-B, p. 8 and PZC Record II, Item 24, p. 13, Appeal #6563; Record, Item 4, p. 13.) CT Page 1396
In May, 1978, the Board granted "a special exception to permit use of an existing dwelling for administrative uses of a non-profit educational institution . . . under Sections 6-94, 6-19, and 6-20 of the . . . Regulations . . ." for the middle parcel on the easterly side of Maher Avenue. (See PZC Record I, Item 18-B, p. 10 and PZC Record II, Item 24, p. 11, Appeal #6047; Record, Item 4, p. 13.)
Section 6-19 (a)(4)(A) of the Regulations gives the Board the power to "[d]ecide requests for special exceptions . . . wherever special exception is authorized in these regulations. . . ." Section 6-94 (a)(5) provides:
 (a) The following uses shall be permitted in . . . R-20 . . . zones when authorized by the Board . . . as special exceptions: . . .
 (5) Churches, educational institutions not operated for commercial profit.
Section 6-20 (c) of the Regulations sets forth the conditions and standards which must be met prior to the granting of a special exception.
Thus, in granting special exceptions in the appeals discussed above (appeals 5118, 7207, 5455, 6563 and 6047) under section 6-94 (a)(5), the Board authorized the use of the three (3) parcels on the easterly side of Maher Avenue as part of a non-profit educational institution. Also, at the public hearing, the Chief Zoning Inspector, Jeanne Shaffer, testified that the proposal complied with the FAR limitation because the four parcels constituted "one tract of land." (Record, Item 4, pp. 65-6.)
In response to Plaintiffs' argument that the residential and school parcels may not be merged, and presumably because no special exception was sought or granted with respect to the headmaster's dwelling itself (see Record, Item 4, pp. 12-14, quoted above), Brunswick revised the FAR Summary to exclude the headmaster's dwelling and 20,000 square feet of property attributable to that dwelling from its FAR calculations. The result was a reduction in the maximum area for additions to 10,910.91 square feet, still in excess of the proposed 10,663 square foot addition. (Record, Item 1(b), FAR Summary, Revised Figures.)
However, there is no evidence that Brunswick subdivided the southern parcel containing the headmaster's dwelling and the cottage/faculty dwelling. Brunswick attributed 20,000 square feet to the headmaster's dwelling presumably because the property lies CT Page 1397 in a R-20 zone, which requires 20,000 square feet per lot; Regulations, section 6-2; but the 20,000 square-foot figure is otherwise arbitrary. (See Record, Item 1(b).) There is no indication where, on the southern parcel, the 20,000 square feet is located except that it includes the headmaster's dwelling, or whether or not it separates the cottage from the remaining parcels such that the land on which the cottage sits would no longer be contiguous to the parcels with which it was supposed to have merged. Therefore, the alternate or revised FAR Summary has no basis in fact or in law.
However, when the Board approved a special exception allowing the conversion of the garage (now "cottage") to faculty housing on the southern parcel, the special exception was not limited to the garage/cottage itself, but affected the use of the whole parcel. Special exceptions relate to the land and permit particular uses of the land; they do not relate to particular uses of structures. 3 Anderson, American Law of Zoning 3d, section 21.01, pp. 631-33, section 21-02, p. 633 (1986 Dec. 1989 Supp. ) Special exceptions, like all provisions in local zoning ordinances, attach to and run with the land. Id. at section 21.01, Supp. p. 102 (citation omitted); Garibaldi v. Zoning Board of Appeals,163 Conn. 235, 239 (1972) (discussing variances); see also Conn. Gen. Stat. section 8-3d (rev'd to 1989) (special permits and exceptions and variances must be recorded in the land records to be effective).
In granting the special exception, the Board necessarily allowed not only the conversion of the garage but a use of the parcel other than that for which it was zoned (i.e. it allowed two dwellings in a single family zone). The parcel was no longer governed by the R-20 restriction; the special exception necessarily authorized the existence of both the headmaster's dwelling and the cottage/faculty dwelling on the same parcel. In other words, the Board allowed the use of the parcel for faculty dwellings as part of a non-profit educational institution. The fact that a building, the garage/cottage, already existed on the land, and therefore, that the application and authorization were phrased in terms of allowing a particular use of that building, does not alter the fact that the special exception relates to the use of the land.
Therefore, the evidence shows that the three (3) parcels on the easterly side of Maher Avenue received a special exception under section 6-94 (a)(5), which allows non-profit educational institutions in an R-20 zone, and, therefore, that a merger of the four (4) parcels would not constitute a merger of school and nonschool property. The facts show "an integrated and interdependent usage" of the four (4) parcels and could reasonably support a finding of intent to merge the four (4) parcels such that the CT Page 1398 Board's acceptance of the original FAR calculations submitted by Brunswick cannot be said to have been arbitrary, illegal or in abuse of its discretion. See Marino, supra at 608, 610; see also Regulations, ss. 6-5 (a)(33) (definition of "lot").
B. Proposed Faculty Apartments
Plaintiffs also contend that regardless of whether the four (4) parcels have merged, the addition of two faculty apartments to the principal Lower School building as proposed would be in violation of the Regulations in that (1) the property containing the School is in an R-20, single family residence zone and already contains at least one single family residence; (2) a "special permit authorizing Brunswick to operate a school in a residential zone does not give it the right to also build apartments"; (3) in an R-20 zone, each residence requires 20,000 square feet of land; and (4) the proposed faculty apartments are not permitted accessory uses.
The first and third points raised by Plaintiffs lack merit. Once a special exception authorizing the use of property in an R-20 zone for a school is approved, the use of the property is no longer governed by the R-20 restrictions applicable when the use is purely residential. In other words, subsequent to the approval of the special exception, a use of the property other than that for which it was zoned is allowed, and the issue then is not whether two apartments would be allowed in an R-20 zone but whether they would be allowed in a school operating as such in an R-20 zone by virtue of a special exception.
As to Plaintiffs' second point stated above, the original special exception authorizing the "use of premises for a private non-profit boys' school" did not also state that Brunswick might build faculty apartments. (Record, Item 5(q).) However, the Board's action now challenged did authorize the addition of two faculty apartments by special exception issued under section 6-94 (a)(5), which allows non-profit educational facilities in an R-20 zone. (Record, Item 9.) Like the special exceptions granted for the three (3) parcels on the easterly side of Maher Avenue, the special exception now challenged authorized the faculty apartments in the school building as part of a non-profit educational institution. The special exception authorizes the faculty apartments as a primary educational use as opposed to an accessory use.
Such action is allowed under the Regulations, section 6-94 (a)(5). See State v. Laurel Crest Academy, 2 Conn. Cir. Ct. 294
(App.Div. 1963). Laurel Crest involved an appeal from a criminal conviction for a violation by the defendant of a zoning ordinance permitting schools and their accessory uses in residential zones. CT Page 1399 The school consisted of nine buildings. Brewster Hall, the building alleged to be in violation of the ordinance, was a one-family house used as a dormitory for twelve students and one faculty member; it was located on land which was near the main buildings of the school but not adjoining any other land of the defendant. Id. at 295-296. The trial court found that Brewster Hall was not a school within the meaning of the zoning ordinance but an accessory use and, therefore, in violation of the ordinance since it was not located on the same lot as the school. Id. at 297.
In setting aside the judgment of the trial court and remanding the case with directions to render judgment for the Academy, the Court in Laurel Crest reasoned that ". . . an ordinance which provides for the construction of a school in a residence zone would encompass the right to erect buildings, equipment and the plant which ordinarily form a part of a preparatory school." Id. at 298 (citing Western Theological Seminary v. Evanston,325 Ill. 518). The court also cited In People ex. rel. Clarkson Memorial College of Technology v. Haggett, 274 App.Div. 732, 734
(N.Y.), wherein it was stated that where the use "was to house students and/or members of [the] faculty and administration staff, . . . such use was one which was incident to and in direct furtherance of an expanded program in higher education. . ." Laurel Crest, 2 Conn. Cir. Ct. at 298-99. The Court similarly relied on Schueller v. Board of Adjustment, 250 Iowa 706, 710
wherein it was held that a dormitory on a lot adjoining a college campus in a residential zone was an educational use of the premises. Laurel Crest, 2 Conn. Cir. Ct. at 299. Also, "[t]o interpret `dormitory' in zoning matters as not being an integral part of a college or school and as not having an educational purpose would be contrary to the ruling of the Court in [Yale University v. New Haven]", wherein the Court "gave a meaning to `dormitory' which designated it as a college." Laurel Crest, supra at 299 (citing Yale University v. New Haven, 71 Conn. 316328). The Court in Laurel Crest concluded that the Academy's student and faculty dormitory was a "school" within the meaning of the ordinance and not an accessory use.
Based on the analysis contained in Laurel Crest and the general language of section 6-94 (a)(5), which does not exclude any uses or structures from the term "educational institutions not operated for profit" (See Laurel Crest, supra at 300), the Board acted properly when it granted the special exception under section 6-94 (a)(5) authorizing the two faculty apartments requested. In doing so, the Board authorized the apartments as a primary educational use, not as an accessory use.
However, even if the faculty apartments must qualify as accessory uses to be permitted, they do not violate the sections CT Page 1400 of the Regulations cited by Plaintiffs. First, Plaintiffs argue that the proposed faculty apartments run afoul of section 6-95, entitled "Permitted Accessory Uses", because they are not "[c]ustomary uses incident to the principal uses." See Regulations, section 6-95. However, Laurel Crest and the cases cited therein make clear that faculty housing is at least customary and incident to schools. See Laurel Crest, supra at 294; see also Lawrence v. Zoning Board of Appeals, 158 Conn. 509
(1969) (discussing meaning of "accessory use").
Plaintiffs also claim that the faculty apartments are prohibited by sections 6-97 (5) [sic: 6-95 (a)(5)], 6-96 (1) and 6-146 of the Regulations. These state as follows:
Sec. 6-95. PERMITTED ACCESSORY USES.
(a) Customary uses incident to the principal uses in Sections 6-93, 6-94 shall be permitted in . . . R-20 . . . Zones. They shall include:
. . .
 (5) The rental and use for residential purposes of dwelling units in accessory buildings, provided the same dwelling units were in lawful existence prior to September 30, 1947.
Sec. 6-96. PROHIBITED ACCESSORY USES.
 The following accessory uses shall be prohibited in . . . R-20 . . . zones:
(1) Separate servants' quarters having housekeeping facilities or accessory dwelling units within or attached to private dwellings except for Elderly Conversions.
Sec. 6-146. USE OF ACCESSORY BUILDING AS RESIDENCE: GUEST HOUSES.
(a) Any accessory building on the same lot with a main residence building shall not be used for residence purposes except in the . . . RA-20 . . . zones for domestic employees of the occupants of the main building and who are employed on the premises. Each accessory building [sic] so used shall have one (1) zoning lot area unit for each such family housed, but in no event may any such accessory building house more than one (1) such CT Page 1401 family.
(b) Any accessory building used for residential purposes shall observe the same yards as required for the principal use and shall not be located any closer to a principal building than twice the minimum side yard required for the zone in which it is located.
(c) Guest houses as defined in Section 6-5 shall be permitted in RA-4 and RA-2 zones only.
First, there is no section 6-97 (5) of the Regulations. Section 6-95 (a)(5), to which Plaintiffs are most likely referring, is inapplicable because that section concerns the use of dwelling units in accessory buildings, not dwelling units in principal buildings such as the School. Additionally, section 6-96 (1) is inapplicable because the faculty apartments will not be within or attached to a private dwelling but within the School building. Further, section 6-146 applies only to accessory buildings and is, therefore, inapplicable because the apartments are to be located in the School building and do not constitute buildings themselves.
Therefore, the Court concludes that the Board did not act improperly in granting the special exception authorizing alterations to permit two faculty apartments in the School building.
C. Predisposition of Commission
Plaintiffs also argue that the Board was "prejudiced and predisposed" to grant Brunswick's application. Plaintiffs argue that the Board's acceptance of testimony from Brunsick concerning the savings to the Town and taxpayers resulting from an increase of students at private schools (Record, Item 4, p. 19) was prejudicial, had no bearing on the merit of Brunswick's application, and should have been rejected. Plaintiffs argue that the failure to reject said evidence tainted the proceedings and deprived opponents of a fair hearing. They assert that once Brunswick improperly solicited favorable consideration of its application based on savings to taxpayers and, therefore, savings to the members of the Board, each member should have disqualified him or herself under section 8-11 of the General Statutes. Plaintiffs go on to argue that Brunswick "misled" the Board by presenting "false testimony as to the illegal enrollment it had knowingly permitted" and that under the circumstances, "an unprejudiced Board would have been suspect of the unorthodox request of faculty apartments within the school ordinarily suspecting this was a means of increasing the size of the school so as to exceed the new [enrollment] limits, as had been the CT Page 1402 practice in the past." Plaintiffs claim that the Board's prejudice is also evidenced by its approval of the application in violation of the .25 FAR limitation and by "the attack by Board members upon a neighbor who was opposed and had questioned . . . the real estate salesman Brunswick relied upon to prove there was no detriment to neighborhood values" (see Record, Item 4, pp. 50-3). Plaintiffs also assert that prejudice and predisposition may be proved by circumstantial evidence, although they cite no authority to that effect, and state that there "were too many circumstances and facts concerning the Brunswick application that defied logic and called for contrary conclusions as to compliance with required standards. Collectively considered they provide circumstantial evidence of prejudice and predisposition."
Section 8-11 of the General Statutes provides, in part, that "[n]o member of any zoning commission or board and no member of any zoning board of appeals shall participate in the hearing or decision of the board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense." Conn. Gen. Stat. ss. 8-11 (rev'd to 1989). Section 8-11 "requires a member of a zoning commission . . . to disqualify himself when the decision of the zoning authority could enure to his pecuniary benefit." Anderson v. Zoning Commission, 157 Conn. 285, 290 (1968) (citations omitted but discussed below). Section 8-11 "also forbids a member of a zoning commission . . . from participating in any matter in which he has a personal interest in the outcome. Id. (citation omitted). "A personal interest is either an interest in the subject matter or a relationship with the parties before the zoning authority impairing the impartiality expected to characterize each member of the zoning authority." Id. "A personal interest can take the form of favoritism toward one party or hostility toward the opposing party; it is a personal bias or prejudice which imperils the open-mindedness and sense of fairness which a zoning official in our state is required to possess." Id. at 290-91.
"Local governments would, however, be seriously handicapped if any conceivable interest, no matter how remote and speculative, would require the disqualification of a zoning official. If this were so, it would not only discourage but might even prevent capable men and women from serving as members of the various zoning authorities." Id. at 291. "The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends on the circumstances of the particular case." Id. (citation omitted); see also Thorne v. Zoning Commission, 178 Conn. 198, 204-5 (1979).
"[A] charge of bias must be supported by some evidence proving probability of bias before an official can be faulted for continuing to execute her duties." Obeda v. Board of Selectmen, CT Page 1403180 Conn. 521, 523-34 (1980). The plaintiff bears the burden of proving a conflict of interest, or personal interest, pecuniary or otherwise. Second Norwalk Corporation v. Planning Zoning Commission, 28 Conn. Sup. 426, 447-48 (C.P. 1969). "The law does not require that members of zoning commissions must have no opinion concerning the proper development of their communities. It would be strange, indeed, if this were true." Furtney v. Zoning Commission, 159 Conn. 585, 594 (1970).
Plaintiff cites no decisions in which the courts have held that board members or commissioners should have been disqualified as having a pecuniary interest where that pecuniary interest takes the form of savings to all taxpayers, nor has research revealed any such decisions. In decisions where the courts have held that a commissioner had a disqualifying pecuniary interest, that interest was of a different nature. For example, Josephson v Planning Board, 151 Conn. 489 (1964), involved a planning board member who received free desk space and telephone service in the office of a realtor who sold the subject property to the applicant. The sale to the applicant was contingent on the planning board's approval. The arrangement between the realtor and board member was for the mutual convenience of the realtor and the board member's employer, an insurance company. In this association, the board member had had two hundred (200) or more mortgage transactions with the realtor on the realtor's sales. The court concluded that the member should have been disqualified under section 8-21, the equivalent of section 8-11 for planning boards, and that the action of the board was invalid. (at 494-95.)
In Lake Garda Improvement Assn. v. Town Plan Zoning Commission, 151 Conn. 476 (1964), the court held that the chairman of the commission should have been disqualified from acting on a company's request for a zone change. The chairman had purchased some of the property from the company while its application was pending. He also had friendship and business dealings with the dominant figure of the company and was associated with groups antagonistic to one of the opponents of the zone change.
Similarly, in Mills v. Town Plan Zoning Commission,144 Conn. 493 (1957), the court found that one of the commission members had a disqualifying interest in the plaintiff's application for a zone change so that a regional shopping center could be developed on her land; the commission member feared that the center proposed by plaintiff would adversely affect the plans of another company to develop a center nearby. The commission member had various real estate dealings with an owner of forty (40) percent of the stock in the other company and had been appointed to the commission by an owner of another forty (40) percent of the stock of the other company. See also East Street CT Page 1404 Residential Partnership v. East Granby Planning and Zoning Commission, 1 CTLR 303 (June 11, 1990) (commission member who owned property across the street from the applicant's property should have disqualified himself under section 8-11); Gill v. Zoning Commission of the Noank Fire District, 2 CSCR 654
(May 22, 1987, Hurley, J.) (chairman's father was employee of applicant and moored his boat at the marina sought to be enlarged by applicant). In the instant case, as to the evidence presented concerning the tax savings resulting from a decrease in enrollment in public schools and an increase in enrollment at private schools, the tax effect of a decrease in public school enrollment is common knowledge and no doubt would be known to the Board members even absent the challenged evidence. If Plaintiffs' argument were accepted, the fact that all citizens are taxpayers would mean that no residents of Greenwich would be able to sit on the Board to hear Brunswick's application or any other application which arguably would reduce or increase local taxes. There is no evidence as to the extent of the savings to each taxpayer annually. Any personal or financial interest which the Board members had as a result of the fact that they are also taxpayers does not rise-to the level of personal or pecuniary interest requiring disqualification under the authorities cited and discussed above.[4]
Also, proceedings before local authorities are informal and conducted without strict adherence to the rules of evidence. Pizzola v. Planning Zoning Commission, 167 Conn. 202, 207
(1974). "[T]here is a strong presumption of regularity in the proceedings of a public body such as a municipal planning and zoning commission. (Citations omitted.) Even if that presumption is rebutted, however, "not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice must be shown." (Citations omitted.)" Murach v. Planning Zoning Commission,196 Conn. 192, 205 (1985). The record does not establish that this evidence formed the basis of the Board's approval; Second Norwalk Corporation, 28 Conn. Sup. at 430; or that it in any way affected the decision; Murach, supra at 206. It was not mentioned by the Board in its decision or in the minutes of the meeting at which the Board voted to approve the application. (Record, Items 9, 6.) To assume that it formed the basis of the decision where this is not borne out by the record would constitute error. Second Norwalk Corporation, supra ___ at 430.
Regarding plaintiffs' claim that an unbiased Board would have denied the application because Brunswick "misled" the Board as to its enrollment figures, there is evidence in the record that Brunswick increased its enrollment in the Lower School to 141 and then to 160 even though the Board had previously limited enrollment to 125 in a prior appeal. (Record, Item 4, pp. 17, CT Page 1405 75-6, 83-5, 87-8, 90-1; Item 5(c), Enrollment Statistics.) However, the fact that enrollment exceeded 125 was also made clear to the Board before it rendered its decision. (Record, Item 4, pp. 17, 75-6, 83-5, 87-8, 90-1; Item 5(c).) The board granted relief from its prior imposed enrollment limitation and authorized a new limitation of 515 students for Upper, Middle and Lower Schools combined, conditioned on submission by Brunswick of certification of the student enrollment to the Zoning Enforcement Officer on the first day of October each year. (Record, Item 9.) Thus, the cap is to be enforced by the Zoning Enforcement Officer.
Furthermore, absent a specific standard authorizing the zoning authority to consider such matters, the zoning authority may not deny an application on the ground that the applicant violated conditions attached to a prior permit. 3 Anderson, supra p. 16, section 21.25. The Regulations do not list prior compliance with permits as a factor to be considered in granting a special exception. See Regulations, section 6-20. Nor may an application be denied based on anticipated violations. 3 Anderson, supra p. 16, ss. 21.25. "The board is not required to anticipate that the applicant would later violate the zoning regulations by a use not authorized by the special exception . . . and should such a violation occur, the ready remedy is by proper legal action at that time." Miklus v. Zoning Board of Appeals,154 Conn. 399, 402 (1967). Therefore, the Board neither had the power nor a reason to deny Brunswick's application based on evidence concerning prior enrollment.
Plaintiff also contends that prejudice is shown because the Board approved an application which violates the FAR limitation. However, it has already been submitted that the evidence supports a conclusion that the FAR limitation was not violated. As to the so-called "attack" by Board members upon Mr. Constas (see Record, Item 4, pp. 50-53), it is submitted that while Board members questioned Mr. Constas to determine that when he moved to his present home, he knew the School was next door, the exchange that resulted does not reveal a personal or pecuniary interest on the part of any Board member which would require disqualification nor does it prove that the Board had made its decision prior to the close of the hearing.
Therefore, it is submitted that the evidence does not demonstrate that the Board was prejudiced or predisposed to grant Brunswick's application.
D. Traffic and Parking
Plaintiffs also argue that the application should not have been approved because the proposal will worsen the already bad traffic situation on Maple Avenue due to the coincidence of School CT Page 1406 traffic with rush hour traffic and inadequate parking facilities. In particular, they point to the queue of cars which extends out of the School entrance onto Maple Avenue during peak periods.
In support of their argument, plaintiffs cite sections6-1 (a)(2) and 6-20 (c)(1) of the Regulations. Section 6-1 (a)(2) provides: "This Article and the zoning regulations contained in this Chapter shall be for the following purposes: . . . (2) Lessening congestion in the streets; . . ." Section 6-20 (c)(1) of the Regulations states that in granting a special exception, the Board "shall find in each case that the proposed building or structures or proposed use of land: . . . (8) Will not create a traffic hazard or congestion due to type or amount of vehicles required or hamper the Town pattern of highway circulation."
Plaintiffs submitted a "Resolution" signed by 35 area residents opposing Brunswick's application on grounds that they are already adversely affected by the traffic generated by the School. (Record, Item 5(o).) They also submitted copies of photographs depicting parking conditions on School property which show cars waiting in the parking lot to drop off or pick up students, crowded parking conditions, and cars parked on the street and lawn during special events. (Record, Item 5(p).) Mr. Constas and plaintiffs testified in opposition and explained how the traffic is already heavy and dangerous and will only get worse. (Record, Item 4, pp. 52-63, 79-80.)
The record shows that both the existing entrance and exit to the School parking area are on the southbound side of Maple Avenue. (Record, Item 5(b), p. 1; Item 5(b), p. 2, Existing Parking Plan.) Maple Avenue is a bi-directional street traveling north and south. (Record, Item 5(1), p. 4, Parking and Traffic Impact Study.) At the beginning and end of every school day, cars queue in the parking area waiting to drop off or pick up students. (Record, Item 5(1), pp. 5-6.) The Parking and Traffic Impact Study submitted by Brunswick shows that the afternoon traffic is worse than the morning traffic and that in the afternoon, a queue of fifteen (15) cars waiting for students to exit the School forms in the parking area, four (4) or five (5) of which back out onto Maple Avenue into the southbound lane and block traffic. (Record, Item 5(1), pp. 5-6.)
The record shows that when the Commission approved the preliminary site plan, it urged Brunswick to proceed to the final site plan stage, indicating that certain modifications must be resolved prior to submission of a final site plan. (Record, Item 5(m), Commission's Decision.) Modification number 7 required Brunswick to develop "a comprehensive school related parking need reduction and management plan", suggested alternatives, and stated that the "geographic area to be considered is the general CT Page 1407 neighborhood of the schools including all school parking sites and neighborhood roadways." It also stated that the "Commission was concerned about [sic] traffic and safety issues attributable to the school due to on-street parking and student drop-off and pick-up. " Modifications 3, 4, and 5 required the submission of plans concerning the relocation and construction of the driveway to the Tree Warden and Town Engineer. (Record, Item 5(m).) The Commission's concerns regarding traffic and parking were also stated in a memorandum to the Town Traffic Engineer, dated August 15, 1989. (See Record, Item 5(f), Response to August 15, 1989 memo.) However, the Traffic Engineer responded that a meeting was held with Brunswick at which Brunswick "addressed all questions and concerns to the satisfaction of this office." (Record, Item 5(f).)
Also, in response to traffic and parking concerns, Brunswick submitted the following information to the Board: In 1987, in response to complaints of parking pressures in the neighborhood of the School, the Town, after a series of hearings imposed an ordinance prohibiting morning parking on Maher Avenue. (Record, Items 5(a)(1), Traffic and Parking Plan Item 5(d), Memo dated 9/20/89.) Since then, Brunswick added 32 parking spaces on its property, limited the number of student permits to juniors and seniors only, took successful measures to encourage the use of school buses and carpools, provided a financial subsidy for the cost of bus transportation for out-of-town students, staggered dismissal times, reduced the need for employee parking by adding six units of on-site faculty housing, and made arrangements with the Second Congregational Church, the Greenwich Women's Club, and the Greenwich Academy for overflow parking during special events. (Record, Items 5(a)(1), 5(d), 5(g).) Also, Brunswick indicated that demand for parking in the 1989/90 school year will be reduced by five driving-age students and that demographic forecasts indicate continued declines in high school enrollments over the next few years. (Record, Items 5(a)(1), 5(d).) A parking analysis and plan were submitted which included figures relating to the demand for parking, spaces available, parking assignments, busing and carpooling, and staggered dismissal times. (Record, Item 5(a)1).) Brunswick submitted evidence that there was no deficit of parking spaces and that there were five (5) spaces available for visitors and overflow parking from the high school. (Record, Item 5(1), p. 10.) Brunswick provided the Board with a list of School special events (Record, Item 5(a)(3)), which it supplies to neighborhood residents (Record, Item 5(d)), and an accident history for nearby Patterson Avenue (Record, Item 5(a)(4)) and for the surrounding streets. (Record, Item 5(1), pp. 8-9, A-8 to A-9.)
Brunswick's Parking and Traffic Impact Study, prepared by Storch Associates [the "Traffic Study"], discusses the CT Page 1408 significance of Maple Avenue during rush hours, indicating that it is a connector to Route 1 to the south and intersects with North Street, a connector to the Merritt Parkway, to the north. (Record, Item 5(1), p. 4.) Also, parking observations, traffic counts and accident histories were included, as well as recommended improvements. (Record, Item 5(1).) Based on the Traffic Study, Brunswick proposed, in addition to the measures discussed above, to move the entrance further south, towards the exit, to create a "two-way" driveway with a median fifteen (15) feet in width separating the entrance and exit. (Record, Item 25(1), pp. 11-12.) This would increase the number of cars which can queue in the parking area from 10 to 30, thereby eliminating the queue of cars onto Maple Avenue and providing room for any increase in traffic to the school. (Record, Item 4, pp. 40-1; Item 5(b), p. 2, Proposed Parking Plan.) David Spear of Storch Associates testified that the expansion of the School and the movement of the entrance would not adversely affect traffic flow. (Record, Item 4, pp. 34-41.)
Plaintiffs claim that the movement of the entrance to the school to a distance of fifteen (15) feet from the exit "is in clear contradiction of the Greenwich requirements, which call for at least 20 feet separation for safety purposes, Greenwich Roadway design Manual, Design Feature, `Minimum Tangent Distance between Driveways — 20'." However, the cited document is not part of the Regulations and is not included in the record. Therefore, the court cannot make a determination as to whether it is applicable under the facts of this case and cannot determine the validity of this claim.
While all of the above evidence would seem to support the Board's decision, the evidence, as plaintiff argues, was based on an increase in enrollment at the Lower School to 170 students. The Chairman of the Board of Trustees of Brunswick, Mr. Everett S. Kosnick, stated that "a hundred and seventy is a forecast." (Record, Item 4, pp. 6, 20.) The Traffic Study submitted by Brunswick with its application for preliminary site plan approval states that it was prepared in May, 1989. (Record, Item 5(1).) At that time, the Lower School enrollment was 141 students. (Record, Item 5(c), Enrollment Statistics; Item 5(1), p. 10.) The Traffic Study submitted with the preliminary application was based on an increase in enrollment at the Lower School to 170 students (Record, Item 5(1), p. 10.) In that study, it is "estimated that 30 new students would generate approximately 5 additional vehicles that would be in the queue waiting to pick up children at the end of the day . . . mak[ing] the queue length approximately 20 vehicles." (Record, Item 5(1), p. 11.) Also, the enrollment statistics submitted to the Board showed the projected enrollment in 1991-92 for the Lower School to be 170 students and the projected enrollment for the Upper, Middle and Lower Schools CT Page 1409 combined to be 515 students. (Record, Item 5(c).)
Rather than approving an enrollment cap of 170 students for the Lower School, the Board approved a limitation of 515 students for the Upper, Middle and Lower Schools combined. (Record, Item 9.) Plaintiffs claim that the Board may not grant relief which was not requested. However, in its application, Brunswick did not request a cap of 170 students. Rather, Brunswick simply requested relief from the prior cap of 125 students imposed by the Board in Appeals #4927 and #5098. (Record, Items 1, 5(q), 5(r).) Plaintiffs also claim that they had no notice of and opportunity to respond to a combined enrollment limitation of 515 students. However the plaintiffs had notice that the board would consider granting relief from the prior enrollment cap and should not have assumed, absent a specific request from Brunswick, that the relief would take any particular form. Brunswick's enrollment figures state that the combined enrollment in the Upper, Middle and Lower Schools is projected to be 515. (Record, Item 5(c).) Also, the 515 figure was discussed at the public hearing and Mr. Kosnick testified that "[t]here's one campus environment that's been created" and that "the kids use different facilities back and forth." (Record, Item 4, pp. 21-2.) Therefore, the Board did not arrive at the 515 figure arbitrarily. Furthermore, "notice of a hearing is not required to contain an accurate forecast of the precise action which will be taken on the subject matter referred to in the notice. It is adequate if it fairly and sufficiently apprises those who may be affected of the nature and character of the action proposed, so as to make possible intelligent preparation for participation in the hearing, if such action seems desirable." Shrobar v. Jensen, 158 Conn. 202, 207 (1969) (citations omitted) (zoning board notice). The notice of the public hearing in the instant case satisfied this standard and plaintiffs received adequate notice to respond fully to the application. (See Record, Item 3.)
Plaintiffs also claim that the Board failed to consider the consequences which would flow from the fact that under the 515 enrollment cap, Brunswick could increase enrollment at the Lower School beyond 170 students. However, the Board acted as it did to give Brunswick flexibility in responding to changing demographics. The Board believed that since the Lower School would have only ten classrooms, student population at the Lower School would be restricted. The Board granted Brunswick's request for relief from the prior enrollment limitation subject to the submission by Brunswick of a certification of the enrollment to the Zoning Enforcement Officer as of the first day of October each year. (Record, Item 9.) Furthermore, while an increase to 170 students would generate a queue of "approximately 20 vehicles" (Record, Item 5(1), p. 11), the proposal would allow a queue of 30 vehicles (Record, Item 4, pp. 40-1). Thus, the Board was of the opinion CT Page 1410 that the size of the Lower School itself would regulate and limit enrollment and that a small fluctuation in the number of students above or below the 170 projection would not have such significant consequences that, for example, a new traffic study must be performed. (Record, Item 9.) The court finds the Board's decision in this respect to be reasonably supported by the record; therefore, the imposition of the 515 enrollment cap is not grounds for sustaining the appeal.
Plaintiffs additionally assert that the application should not have been approved because it violates the applicable level of service standard. "Level of service" is a term "utilized to describe the ability of a roadway intersection to handle its traffic assignment." (Record, Item 5(1), p. 3.) More specifically, plaintiffs claim that the Greenwich Plan of Development states that it "should be Town policy, insofar as possible, to maintain the "C" Level of Service standard for the future", and that the future level of service at the site will be a "D" level.
However, the record shows that this claim was not raised before the Commission. "To allow a court to set aside an agency's determination `upon a ground not theretofore presented . . . deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action."' Hartford Electric Light Co. v. Water Resources Commission, 162 Conn. 89, 107 (1971); Valley View Convalescent Home, Inc. v. Commission on Hospitals,32 Conn. Sup. 300, 302 (C.P. 1975). "A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented . . ." View Convalescent Home, 32 Conn. Sup. at 302 (citing Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 155). Also, it is well established that a plaintiff must exhaust his administrative remedies before appealing to a court of law. Conto v. Zoning Commission, 186 Conn. 106, 114-15 (1982). The doctrine of exhaustion is "`grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's finding and conclusions.'" Sharkey v. Stamford, 196 Conn. 253,256 (1985) (citation omitted) (discussing doctrines of exhaustion and primary jurisdiction).
In the instant case, the Board has been deprived of an opportunity to consider this issue, make a ruling and state its reasons therefor, and the court has been deprived of the Board's findings and conclusions on this issue. Thus, plaintiffs' failure to raise this claim before the Board prevents them from raising it on appeal.
E. Effect on Neighborhood CT Page 1411
Plaintiffs also claim that the proposed additions and alterations will have additional negative effects on the neighborhood and will violated various sections of the Regulations. First, plaintiffs argue that the "extra cars [traveling to and from Brunswick] would add to the pollution and adversely affect [plaintiffs'] health and would constitute a nuisance." They claim that the Board failed to consider this threat to the health of area residents and failed to require an "impact statement" addressing this issue.
In support of their claim that the Board must consider the pollution which will be caused by Brunswick's proposal, plaintiffs cite section 6-1(a)(1) and (8) and section 6-20 (c)(3) of the Regulations. Section 6-1 entitled "Purpose of Article" and the subsections cited provide:
 (a) This Article and the zoning regulations contained in this Chapter shall be for the following purposes
 (1) Promoting the health, safety, morals and general welfare of the community; . . .
 (8) Providing for the comfort and general welfare in living and working conditions; . . .
Section 6-20(c)(3) provides:
 (c) All determinations of the Board of Appeals shall be made after public notice and hearing and subject to appropriate conditions and safeguards in accordance with the public interest and the comprehensive plan set forth in this Article, and in harmony with the purpose and intent expressed in Section 6-1. The Board shall grant all applications for special exceptions, subject to the aforesaid conditions and safeguards, provided that the particular requirements specified in this Article are met, and provided further that the Board shall find in each case thatched proposed building or structures or proposed use of land: . . .
 (3) Will not create or aggravate a nuisance or result in the dissemination of odors, smoke, dust, gas, fumes, or other atmospheric pollutant, noise, light, heat, glare, vibration or radiation, electro-magnetic or other interference with radio or television reception beyond the boundaries of the lot on which the use is located.
CT Page 1412
In granting the special exception, the Board found that "the requirements specified in section 6-20 have been met." (Record, Item 9.) The only material presented to the Board by plaintiffs on the issue of pollution consists of the following statements by Mr. Constas during the public hearing:
 I would like also to talk about the pollution. I don't — I think there's more so an additional problem. We all know if one of the simplest ways of committing suicide is to leave your motor on in the garage and you'll be dead in a few —
 I was saying that you don't have to go into the garage. You can commit suicide out in the open if you're close enough to the exhaust and it's so deadly, the exhaust from an automobile is so deadly and we are all suffering from it. We're getting more conscious of it but we also know that the closer you are to this source of exhaust the more hazard it is, the more deadly the disease you will get and generally you will get lung cancer which has a three percent cure. It's a deadly disease and it can be visited on anybody in the proximity of these highways.
 There have been extensive studies on this and you will find the closer you are to a main highway the more likely you are to have disease. The one I found closest to this was one done on a street which had five thousand cars, a main street in town. Of the 70 deaths from cancer on this street, of the 73 deaths. 70 were people who lived on that main street and this was a street that had five thousand cars. Maple has twelve thousand cars, two and a half times, so what chance do we have, and if you throw more cars into this small area, I don't know what's going to happen.
 Also, the queuing is dangerous. The reports show that the exhaust from the queuing car is three times what a moving car is. So you have a lot of queuing. You have exhaust.
 Also, it shows children are more susceptible to respiratory ailments and pulmonary disease and here you have this parking lot full of cars all with the motors going, waiting, queuing and the whole neighborhood becomes polluted.
 I don't think it's necessary unless we're accomplishing something.
CT Page 1413
(Record, Item 4, pp. 63-64.) The report(s) itself was not submitted.
In their brief dated May 4, 1990, plaintiffs ask that the court "take judicial notice of the connection between traffic congestion and disease, the concern of those living on extensively traveled public highways, and the increase of disease and death from pollution, based on proximity to the source of the pollution . . . [and] the fact that additional traffic must be generated by additional students, and that additional traffic generates additional pollution." However, in an administrative appeal, it is not the function of the court to make findings of fact. Primerica v. Planning Zoning Commission, 211 Conn. 85, 96
(1989); Burnham v. Planning Zoning Commission, 189 Conn. 261,266 (1983). The issue is "whether the record before the agency supports the decision reached." Primerica, 211 Conn. at 96. Therefore, the court cannot take judicial notice as requested. The plaintiffs have failed to sustain their burden of proving that the Board acted improperly. See Adolphson v. Zoning Board of Appeals 205 Conn. 703, 707.
Plaintiffs also seem to be arguing that they introduced enough evidence on the issue of pollution to make out a "prima facie case" under section 22a-17 of the General Statutes, that the case, and that the court must review the issue of whether the Board should have required an environmental impact statement. In support of these propositions, plaintiffs cite Manchester Environmental Coalition v. Stockton, 184 Conn. 51 (1981).
Section 22a-14 through 22a-20 of the General Statutes are known as "The Environmental Protection Act of 1971." Conn. Gen. Stat. section 22a-14 (rev'd to 1989). Section 22a-16 allows any person to bring an action for declaratory and equitable relief "for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction." Conn. Gen. Stat. section 22a-16
(rev'd to 1989). Section 22a-17, the section cited by plaintiffs, provides:
Section. 22a-17. Defense. Appointment of master or referee.
 (a) When the plaintiff in any such action [for declaratory and equitable relief] has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. CT Page 1414 The defendant may also prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare. Except as to the aforesaid affirmative defense, nothing in this section shall be construed to affect the principals of burden of proof and weight of the evidence generally applicable in civil actions.
 (b) The court before which such action is brought may appoint a master or referee . . . to take testimony and make a report to the court . . .
First, the instant case is not an action for declaratory and equitable relief under sections 22a-16 and 22a-17, but an administrative appeal under section 8-8. Second, as already noted, although plaintiffs claim to have presented evidence on the issue of pollution, the record contains no such evidence except for their opinions and a representation that a report supporting their position exists. (Record, Item 4, pp. 63-64.) Thus, even if the instant case was brought under section 22a-17, the plaintiffs have not "come forward and show[n] that the defendant has, or is reasonably likely to unreasonably pollute, impair, or destroy a natural resource." Manchester Environmental Coalition, supra at 58 (discussing a plaintiff's burden under section 22a-17
at pages 57-59).
Also, the plaintiffs cite Manchester Environmental Coalition for the proposition that an agency's determination that no impact statement is necessary is subject to judicial review. See Manchester, at 67 n. 20. However, the court in that case was discussing section 22a-1b(b), part of the Environmental Policy Act, which provides that "[e]ach state department, institution or agency responsible for the primary recommendation or initiation of actions which may significantly affect the environment shall in the case of each such proposed action make a detailed written evaluation of its environmental impact. . . ." Conn. Gen. Stat. ss. 22a-1b(b) (rev'd to 1989) (emphasis added). The "purpose of the Environmental Policy Act is to ensure . . . consideration of environmental risks . . . before the state commits its resources to the particular use of a site." Westport v. State 204 Conn. 212,220 1987) (emphasis added) (citations omitted). The Board is not a state agency. See Klug v. Inland Wetlands Commission, 19 Conn. App. 713,716-720 (1989) (UAPA definition of "agency" as "state board, commission, department or officer" does not include CT Page 1415 municipal inland wetlands agency). Thus, section 22a-1b(b) does not require the Board to prepare an environmental impact report. Nor do the sections of the Regulations governing the requested special exception state that such a report is required. See Regulations, section 6-19, 6-20, 6-94 (a)(5).
Therefore, on the issue of air pollution, the plaintiffs have failed to sustain their burden of proving that the Board acted arbitrarily, illegally, or in abuse of its discretion.
In various sections of their briefs, plaintiffs have also raised the following claims: They argue that any additional building by Brunswick would violate the spirit of the Regulations in that their purposes, as stated in sections 6-1(a)(5) and (7), are "[p]reventing over crowding of land and avoiding undue concentration of population," and "[c]onserving the value of buildings. . . ." They also claim that the proposal will violate section 6-20 (c)(5), which requires that the proposed use or structure "[w]ill not be detrimental to the neighborhood or its residents or alter the neighborhood's essential characteristics."[5]
The record shows that Paul Hopper, an architect who testified on behalf of Brunswick, presented slides to the Board of the existing buildings and the proposed additions and alterations. (Record, Item 4, pp. 30-33; Item 5(j), Slides; Item 5(k), Photographs.) Floor plans and elevation drawings were submitted. (Record, Item 5(b).) Also, Thomas Gorin, a realtor who spoke on behalf of Brunswick, testified that the proposed addition will be in keeping with the character of the neighborhood, that in his experience, residential neighborhoods which have schools are more attractive to potential buyers, and that the additions are not large and would not snuff out light. (Record, Item 4, pp. 43-45.) An area resident and parent of a Lower School student wrote a letter in which she stated that architecturally, the proposed plans are more in keeping with the character of the neighborhood than the existing structure. (Record, Item 5(n).) She also stated that Brunswick had been a generous and good neighbor. (Record, Item 5(n).) Also, the record shows that only one tree will have to be removed. (Record, Item 5(k).) Screening will be enhanced by additional plantings. (Record, Item 4, p. 31.)
The plaintiffs ask the court to "take judicial notice of the adverse affect [sic] of large non-residential structures in a neighborhood of otherwise beautiful homes." First, there is testimony and evidence that the neighborhood is not solely a residential one but that in addition to Brunswick School, the Stanton House, dentists' offices, law offices, the Women's Club, a therapy office, The Second Congregational Church, and the Greenwich Academy are all located in the Maple Avenue area. CT Page 1416 (Record, Item 4, pp. 43-45; Item 5(d), p. 3.) Secondly, judicial notice is taken of "matters of established fact, whose accuracy cannot be questioned. (Section 21 Connecticut Evidence, Holden Daly.) The accuracy of the effects of "non-residential structures in a neighborhood of otherwise beautiful homes" does not rise to the level of established fact. There are variables such as the economic state of the locale, the zoning regulations of the locale, and the condition of the various properties, that militate against a general rule about such adverse impact.
For the foregoing reasons, the Court finds that the record supports the Board's decision with regard to these issues and the appeal is denied.
LEHENY, JUDGE
ENDNOTES